UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

KINGSWAY FINANCIAL SERVICES,          :
INC., et al.,
                                      :

                   Plaintiffs,
                                      :     03 Civ. 5560 (RMB)(HBP)
     -against-
                                      :     OPINION
PRICEWATERHOUSE-COOPERS LLP,                AND ORDER
et al.,                               :

                   Defendants.        :

----------------------------------X

          PITMAN, United States Magistrate Judge:


I.  Introduction


          By letter dated August 8, 2008, Defendants

PricewaterhouseCoopers LLP ("PWC") and John A. Dore move for

sanctions pursuant to Fed.R.Civ.P. 37(b)(2) on the ground that

plaintiffs American Country Holdings, Inc. ("ACHI") and Kingsway

Financial Services, Inc. ("Kingsway") violated my Orders, dated

January 29, 2008 and February 28, 2008.  Specifically, defendants

allege that plaintiffs violated both Orders by repeatedly provid-

ing misleading and improper responses to PWC's interrogatory

requesting that plaintiffs identify the person employed by

Kingsway "with the most knowledge regarding the amount of damages

and the computation thereof."  Defendants further claim that

these misleading responses caused them to take an unnecessary

deposition of Kelly Marketti.  For the reasons set forth below, defendants' motion is granted.

II.  <u>Facts</u>

       Kingsway and ACHI commenced this action against Martin L. Solomon, Edwin W. Elder, William J. Barrett, Wilmer J. Thomas, Jr., Karla Violetto ("Director Defendants"), John A. Dore, and PWC, alleging securities fraud, common law fraud and conspiracy in connection with Kingsway's purchase of ACHI.  The plaintiffs allege that from 1999 through 2002, the defendants "fraudulently caused and maintained an inflated stock price of ACHI through their actions . . . ." (Plaintiffs' Third Amended Complaint, dated April 28 2005, at ¶ 4).  Plaintiffs' allegations are set forth in detail in an opinion issued by the Honorable Richard M. Berman, United States District Judge, <u>Kingsway Fin. Servs., Inc. v. PricewaterhouseCoopers, LLP, et al.</u>, 420 F. Supp.2d 228 (S.D.N.Y. 2005) (granting in part and denying in part defendants' motion to dismiss); familiarity with this opinion is assumed. The plaintiffs have settled their claims against the Director Defendants, leaving Dore and PWC as the only defendants remaining in this action (Docket Item 291).

A.   <u>The Present Discovery Dispute</u>

Plaintiffs have resisted providing a detailed descrip-
tion of the methodology used to calculate their damages from the
start of this litigation.  In their Rule 26(a)(1) disclosures
plaintiffs identified the amount and categories of the damages
they were seeking but refused to disclose the calculations
underlying those damage figures because they intended to rely
upon expert testimony to prove damages.  Defendants subsequently
moved to compel plaintiffs to disclose their calculations and on
May 26, 2006, I ordered plaintiffs to "identify by Bates number .
. . the documents it will or has submitted to its damages expert"
(Docket Item 104 at 2).  I also ruled that "since plaintiff has
committed to providing its damages solely through expert testi-
mony, apart from offering testimony necessary to authenticate
documents on which its expert relies, plaintiff is precluded from
proving damages through non-expert testimony"  (Docket Item 104
at 3).

The present dispute stems from PWC's first set of
interrogatories, dated May 17, 2006, which requested

With regard to your claim for damages in this lawsuit:

(a) identify each category of damages sought;

(b) provide a computation of each category of
damages alleged;

(c) for each category of damages identify the
person employed by Kingsway with the most knowl-

3

edge regarding the amount of damages and the com-
putation thereof;

(d) identify each document relevant to the compu-
tation of each category of damages alleged, in-
cluding but not limited to pertinent insurance
agreements, and state how each identified document
supports the calculation; and

(e) to the extent documents have not already been
produced, state the custodian and location of
documents relevant to the computation of each
category of damages alleged.

(Defendant PricewaterhouseCoopers LLP's First Set of Interroga-
tories to Kingsway Financial Services, Inc., dated May 17, 2006,
("PWC Interrogatory No. 1"), attached as Ex. A to the Letter of
Jeffrey M. Greilsheimer, Esq., dated August 8, 2008 ("Greilshei-
mer Letter")).

At a conference held before me on January 28, 2008,
plaintiffs explained that they did not want to disclose the
methodology by which they calculated their damages because they
were concerned that their calculations (1) might change after
fact discovery, and (2) might give defendants' fact witnesses "a
road map" as to how they should testify (Transcript of Confer-
ence, dated January 28, 2008 ("Tr.") at 66-70).  Plaintiffs also
noted that they had already provided information responsive to
subsection (c) of the interrogatory and that they had no problem
identifying the Kingsway employee most knowledgeable about the
amount and computation of damages (Tr. 75).  At the conclusion of
the conference, I ordered plaintiffs to respond to PWC Interroga-

4

tory No. 1 and I addressed plaintiffs' concerns, as follows:  (1)
I explained that Fed.R.Civ.P. 26(e) requires a party to update
its damage calculations if they turn out to be inaccurate (Tr.
81); and (2) in my Order, dated January 29, 2008, I directed that
"plaintiffs' response to this interrogatory shall not be dis-
closed to anyone other than counsel of record in this action"
(Docket Item 375; January 29, 2008 Order attached as Ex. B to
Greilsheimer Decl. at 4, 5).

On February 19, 2008, plaintiffs amended their response
to PWC Interrogatory No. 1 by specifying a total of $205,160,975
in damages, broken down into the nine categories set forth below:

|  | Category | Amount of Damages (US$) |
|---|---|---|
| 1 | Materially Understated Reserves | 50,425,508 |
| 2 | Reinsurance Premium False Booking | 3,327,000 |
| 3 | Tax Account Misstatement | 2,106,000 |
| 4 | Lease Costs (500 West Madison) | 1,156,651 |
| 5 | 12/31/01 Restatement Costs | 2,605,742 |
| 6 | Cost of Capital -- Near-term removal from equity markets (2002-03) with fund rais-ing via debt (vs. equity) | 107,393,541 |
| 7 | Currency Losses Due to Funding Mismatch | 5,139,697 |
| 8 | Time Value of Losses for Damages Crystal-lized prior to 3/31/06 | 23,656,835 |
| 9 | Near-term Loss in M&A Opportunity | 9,350,000 |
|  | **TOTAL:** | **205,160,975** |

(Plaintiffs' Response to Defendant PricewaterhouseCoopers LLP's
First set of Interrogatories to Kingsway Financial Services,

5

Inc., dated Feb. 19, 2008 ("Plfs.' First Response to PWC's Interrogatories") at 4, 5, attached as Ex. C to the Greilsheimer Letter).   In response to subsection (c) of the Interrogatory, plaintiffs stated:

> Subject to the foregoing objections[1] and to the general Objections and in addition to all persons named in any previous disclosures or interrogatories, Plaintiffs identify the following individuals in response to subsection (c):
>
> > a.  W. Shaun Jackson, Chief Executive Officer, Kingsway;
> >
> > b.  Shelley Gobin, Chief Financial Officer, Kingsway; and
> >
> > c.  Any employee of Kingsway who supplied, reviewed, prepared, created, or supervised the production of financial data and documents used in Plaintiffs' calculation of the aforementioned damages, including all comparable employees of ACHI.

(Plfs.' First Response to PWC's Interrogatories at 8, 9).

Defendants objected to plaintiffs' response to subsection (b) and subsection (c) as violating my January 28, 2008 Order.   On February 28, 2008 during a telephone conference, William R. Maguire, Esq., counsel for defendant PWC, explained

---

[1]Plaintiffs objected to this interrogatory on the grounds that it was vague, ambiguous, unreasonable, and unduly burdensome "to require plaintiff[s] to identify any one individual as having the most knowledge among the many departments and employees of Kingsway that have participated in the calculation of the various damages components."   Plaintiffs further objected to Subsection (c) because it "seeks information outside the scope of the January 29, 2008 Order of the Honorable Henry B. Pitman, U.S.M.J." (Plfs.' First Response to PWC's Interrogatories at 8, 9).

What we asked, and what the court's directed Kingsway
to provide us, was with the facts.  We need to know
what are the facts concerning Kingsway's damages . . .
. we need, in each case, for each component of damages,
each number that was used in each of those calcula-
tions.  We don't have that . . . .  And it is no answer
and it is not compliance, we respectfully submit, for
Kingsway to say that these answers are to be found
somewhere in thousands of pages of documents that they
have provided to their experts.  And we cannot find
those facts in those documents.  If we could find them,
frankly, we would not be bothering the Court, but we
can't . . . . And in some cases, Your honor, we don't
have a clue.

                *     *     *

By way of example, if the Court has at hand Mr.
Greilsheimer's letter . . . . you will see at the
bottom of the page, under subject of "Reserves", an
amount of damages that is computed to be $15 million .
. . .  That number appears to come from two numbers,
the big one of which is $153 million, which purports to
be the actual payments between year-end '01 and the end
of March in [sic] 2006.  But we do not have, by way of
example here, the very first item that they provide us,
$50 million on damages.  We do not have the calculation
for this $153 million number.

                *     *     *

The last damage computation they have at Page 8. It's
item number nine and that refers to a damage calcula-
tion for a near term loss in mergers and acquisitions
for M&A Opportunity.  From that, I read that . . . to
mean that Kingsway is seeking damages for a lost oppor-
tunity to either buy or sell a company . . . .  But I
have no idea what company they are referring to.  If
Kingsway knows these facts, apparently down to the
decimal point, then Kingsway should tell us what these
facts are . . . . who are the people who can tell us
the facts about each of these opportunities.

(Transcript of Telephone Conference, dated February 28, 2008

("Telephone Conf. Tr.") at 4-7).  Regarding plaintiffs' response

to subsection (c), Mr. Maguire stated

> We asked, who are the people most knowledgeable . . . .
> We just want to know who do we depose.  Now, Kingsway
> has identified two executives.  That's fine, but . . it
> doesn't say whether they can address everything . . . .
> If they can't then we need to know who else do we need
> to talk to[.]  That's why we asked for the people who
> are most knowledgeable . . . . And if that's another
> person, or another ten people, we need a clear answer .
> . . .

(Telephone Conf. Tr. at 9).  Plaintiffs' counsel, Harold J.

Ruvolt, Esq., and I then had the following exchange with regard

to subsection (c)

| | |
|---|---|
| The Court: | And I was really quite surprised when I saw your response [to subsection (c) of PWC's Interrogatories No. 1] after having told me in open court on the record that you had no objection to it. |
| Mr. Ruvoldt: | That -- and Your Honor, we answered that question identifying the two people at the company because the question asked for employee. |
| The Court: | Yeah. |
| Mr. Ruvoldt: | It doesn't ask for retained experts.  We answered that the former Chief Financial Officer who is now the Chief Executive Officer, Sean Jackson, and Shelly Govan are the people most knowledgeable, and there are a number of employees at both companies who (indiscernible) the production of the financial data which was turned over. |
| The Court: | Yeah.  That's not identification . . . . Identify is defined in the local civil rules and saying "and there are some other unidentified people out there" is not identification. |
| Mr. Ruvoldt: | Your Honor, if that is the problem, I am more than happy -- you know, there are an enormous number of people who provide |

8

financial data.  The people who do the
claim setting.  I mean that -- he asked
for people most knowledgeable.  That was
a and b, but we felt that we needed to
disclose that the material that a and b
has available to them comes from a lar-
ger universe of people at these compa-
nies.  If the complaint is we didn't
give him the names of that large uni-
verse, I would be more than happy to do
that, but then I suspect we're going to
be back here arguing that we gave him a
hundred and eighty names.

The Court:       . . . . The notion that there are in
excess of a hundred and eighty witnesses
who are the most knowledgeable witnesses
concerning damages seems a little sus-
pect to me, but . . . the resolution of
that may have to await the taking of
depositions . . . .

(Telephone Conf. Tr. at 12-14).  Following this conference, I

granted defendants' application to compel a further response to

PWC's interrogatory and ordered plaintiffs to "serve a supplemen-

tal response, fairly responding to all parts of the interroga-

tory" ("February 28, 2008 Order") (Docket Item 258 at ¶ 11).

      Plaintiffs' supplemental response provided signifi-

cantly more detail regarding the computation of damages and, in

response to subsection (c), designated W. Shaun Jackson, Shelley

Gobin, and Kelly Marketti as "the employees with the most knowl-

edge regarding the amount of damages in [all nine categories], as

defined in the interrogatory, other than experts" (Plaintiffs'

Supplemental Response to Defendant PricewaterhouseCoopers LLP's

First Set of Interrogatories to Kingsway Financial Services Inc.,

dated March 4, 2008 ("Plfs.' Supplemental Response") at ¶¶ 1(c), 2(c), 3(c), 4(c), 5(c), 6(c), 7(c), 8(c), 9(c), attached as Ex. E to the Greilsheimer Letter).

On August 7, 2008, defendants took Marketti's[2] deposition, at which she testified that she had never seen plaintiffs' damage calculations and had no knowledge regarding the damages that plaintiffs were claiming in this action (Marketti Dep. Tr. 11, 12).  In response to general questions regarding each category of damages, Marketti testified that she did not have any knowledge of the figures, calculations, or computations contained in each of the nine categories of damages (Marketti Dep. Tr. 24-26, 30-31, 47-48, 67).  For example, when defendants' counsel attempted to explore Marketti's knowledge with respect to category 1, "Materially Understated Reserves,"[3] she testified that she had no knowledge of who had prepared American Country's

---

[2]Marketti testified that she began working for Kingsway on June 3, 2002 as a controller responsible for the day to day accounting activities including preparing Kingsway's monthly financial statements. (Transcript of the Deposition of Kelly Marketti, dated August 7, 2008 ("Marketti Dep. Tr.") at 6, 8, attached as Ex. F to the Greilsheimer Letter).

[3]According to plaintiff, "this damages component identifies the gap that existed between the reserves that Kingsway observed to be on the books of ACHI and the amount that was thereafter paid out net of the reserves at the time of acquisition."  This damages category is further divided into a damages figure of $30,512,294, representing the payments made between December 31, 2001 and March 31, 2006 in excess of the reserves on the books of ACHI at the time of acquisition and a damages figure of $19,913,214, representing the cost of adjusting the reserves after acquisition (Plfs.' Supplemental Response at 3).

reserves and, in the following exchange, stated that she did not even know Kingsway had suffered adverse developments in its reserves.

> Q:   In 2002 and 2003, Kingsway suffered adverse devel-opment in its reserves for unpaid claims?
>
> Ms. Fleming:   Objection to Form.
>
> A:   Not that I recall.
>
>             *     *     *
>
> Q:   In 2002, Kingsway increased its reserves for prior-year claims by over $100 million is some-thing you're aware of, is it not?
>
> Ms. Fleming:   Objection to Form.
>
> A:   Not that I can recall in my role at that time.
>
> Q:   In 2003, Kingsway increased its reserves for prior-year claims by $196 million.  Is that some-thing that you're aware of?
>
> Ms. Fleming:   Objection to Form.
>
> A:   Not that I recall.

(Marketti Dep. Tr. 15, 21).  When asked if she had knowledge of any of the documents listed in Plfs.' Supplemental Response, she testified that she only had knowledge of the invoices memorializ-ing the professional costs contained in category 5, the loan agreement that formed the basis for the figures contained in Facility 2 of category 6, and the $40 million loan that formed the basis of the category 7 damages (Marketti Dep. Tr. 39, 79-80).  Marketti's knowledge of these figures, however, was quite limited.  For example, regarding category 6, "Cost of Capital

11

from Near-Term Removal from Equity Markets,"[4] Marketti testified
that she had no knowledge as to how any of the different discount
rates applied to Facility[5] 1, Facility 2 (Tranche 1, 2, 3, 4, 5,
and 6), and Facility 3 had been determined (Marketti Dep. Tr. 39-
44).  She stated that she did not know why the interest rate for
Facility 2, Tranche[6] 1 was listed as the three-month LIBOR[7] in
one section of plaintiffs' damage calculations and the three-
month LIBOR plus 4% in another section of plaintiffs' damage

_____

[4]Plaintiffs claim that this damages category accounts for
damages allegedly sustained because plaintiffs "were restricted
from accessing the United States equity market from late 2002
through 2003, forcing plaintiffs to resort to the debt markets to
raise capital.  The increased costs of borrowing, in cash terms,
totals $107,393,541 for the three debt facilities plaintiffs
entered into during the relevant time period.  The damages are
the net present value (as of March 31, 2006) of the total
interest payments for each facility" (Plfs.' Supplemental
Response at 9).

[5]Plaintiffs' Supplemental Response explained that due to
plaintiffs' lack of access to the United States equity markets
from 2002 through 2003, plaintiffs were forced to enter into
three debt facilities during this time-period.  Damages for
category 6 consist of the total interest payments remaining on
these three debt facilities plus the total interest payments made
up to March 31, 2006 (adjusted to correspond to its Net Present
Value)(Plfs.' Supplemental Response at 9).

[6]A tranche is a portion or a specific class of bonds within
a structured finance deal.  In this case, Facility #2 was divided
into six tranches issued between December 4, 2002 and December,
6, 2003.

[7]LIBOR is an abbreviation for the London Inter-Bank Offer
Rate, the interest rate that banks charge each other for loans.
The LIBOR is officially fixed once a day by a small group of
large London banks, but the rate actually charged fluctuates
throughout the day.

calculations (Marketti Dep. Tr. 39-40)[8].  She also had no knowl-
edge as to why the damage calculations included interest paid up
to March 31, 2006 but failed to include interest payments made
after that date (Marketti Dep. Tr. 42).

Marketti was also questioned about category 7, "Losses
due to Currency Mismatch," which were allegedly incurred as a
result of Kingsway being forced to borrow in Canadian dollars
when "the Canadian dollar was weak against the U.S. Dollar"
(Plfs.' Supplemental Response at 16).  The cost of borrowing $40
million in Canadian dollars was calculated by taking "the rele-
vant exchange rate (C$1.5510 to US$1.00) at the time of the wire
transfer [] compared [] with the appropriate exchange rate of
1.37440 as at July 15, 2003" (Plfs.' Supplemental Response at
16).

> Q:   Do you know what the significance of that date
>      [July 15, 2003] is?
>
> A:   No.
>
> Q:   You'll see in the table it has U.S. dollars 40
>      million and Canadian dollars in certain amounts.
>      Do you see that?
>
> A:   Yes.
>
> Q:   Do you know who calculated the exchange rate?
>
> A:   No.

---

[8]She also lacked knowledge regarding the disparities between
the interest rates noted in the text for Tranche 2, 3, 4, 5, 6
the lower interest rate noted in the charts for these Tranches
(Marketti Dep. Tr. 42-44).

13

*     *     *

```
Q:   Do you have any idea what the source was used for
     obtaining the exchange rate?

Ms. Fleming:   Objection to Form.

A:   I do not recall.

Q:   Do you have any knowledge of Kingsway obtaining a
     loan of $40 million U.S. or Canadian $78 million
     on or about December 6th of '02?

A:   I do not recall.
```

(Marketti Dep. Tr. 45-46).

Finally, regarding category 9, "Near-Term Loss in M&A

Opportunity,"[9] Marketti testified that she lacked any knowledge

regarding this category of damages.

```
Q:   And you have no knowledge of what is meant by any
     of the information here concerning the near-term
     loss in M&A opportunity?

Ms. Fleming:   Objection to Form.

A:   No.

Q:   You have no idea what that M&A opportunity was?

Ms. Fleming:   Objection to Form.

A:   No.
```

(Marketti Dep. Tr. 48).

_____

[9]According to plaintiff, "this damage component is based on
the measurable, potential gain based on a run-off opportunity
which takes into account the target return date, the nature and
profile of the lines being run-off; the extent to which IBNR in
the run-off is sufficient to meet future and ongoing claims and
other adjustments" (Plfs.' Supplemental Response at 19).

III.  <u>Analysis</u>

By letter dated August 8, 2008, Defendants move for
sanctions pursuant to Fed.R.Civ.P. 37(b)(2) on the ground that
plaintiffs have violated my Order dated January 29, 2008 and my
Order dated February 28, 2008 by designating Marketti as one of
three witnesses with "the most knowledge" about the damages that
plaintiffs claim in this action.  Defendants contend that "by
identifying Ms. Marketti as one of its three most knowledgeable
witnesses, Kingsway caused defendants to take an unnecessary
deposition and waste resources that should have been directed at
completing fact discovery in time to meet the deadline for the
conclusion of all discovery on December 31" (Greilsheimer Letter
at 4).  Accordingly, defendants seek an order requiring Kingsway
to pay the costs and fees incurred in deposing Marketti.

In response to this motion, plaintiffs argue that any
"dissatisfaction with the utility of Kelly Marketti's deposition"
lies entirely with the examiners, who plaintiffs contend asked
"inarticulate" and "general" questions aimed at eliciting plain-
tiffs' damage computations instead of the facts of the underlying
transactions (Letter of Harold Ruvoldt, Esq., dated August 22,
2008 ("Ruvoldt Letter"), at 7, 11-13).  In addition, plaintiffs
argue that Marketti did indeed provide useful testimony regarding
several facets of the damage calculations, and could have pro-
vided other useful information if the defendants had asked

follow-up questions or asked Marketti if she could identify actual documents instead of just showing her the bates numbers of various documents (Ruvoldt Letter at 9-12).

A.   Rule 37(b)(2) Sanctions[10]

Fed.R.Civ.P. 37(b)(2) provides that a court may impose sanctions against a party that "fails to obey an order to provide or permit discovery . . . ."  Fed.R.Civ.P. 37(b)(2). See Salahuddin v. Harris, 782 F.2d 1127, 1132-33 (2d Cir. 1986); Glencore Denrees Paris v. Dep't of Nat. Store Branch, 99 Civ. 8607 (RJS), 2008 WL 4298609 at *4 (S.D.N.Y. Sept. 19, 2008) ("Where one party fails to respond to a discovery request, or provides evasive or incomplete responses, the aggrieved party may seek an order to compel disclosure . . . . District Courts possess broad discretion to impose sanctions and afford relief if a party disobeys an order to compel discovery"); Burns v. Imagine Films Entm't, Inc., 164 F.R.D. 594, 598 (W.D.N.Y. 1996).  "[D]iscovery orders are meant to be followed.  'A party who flouts such orders does so at his peril.'"  Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 853 (2d Cir. 1995), quoting Update Art, Inc. v. Modiin Publ'g, Ltd., 843 F.2d 67, 73 (2d Cir. 1988).

---

[10]I need not consider whether sanctions would be proper under Rule 37(d), Rule 26(g)(2),(3) or 28 U.S.C. § 1927 because defendants have only moved for sanctions pursuant to Rule 37(b)(2).

"A district court has wide discretion in imposing sanctions, including severe sanctions, under Rule 37(b)(2), and will only be reversed if its decision constitutes an abuse of discretion." <u>Daval Steel Prods. v. M/V Fakredine</u>, 951 F.2d 1357, 1365 (2d Cir. 1991), <u>citing</u> <u>Bobal v. Rensselaer Polytechnic Inst.</u>, 916 F.2d 759, 764 (2d Cir. 1990); <u>John B. Hull, Inc. v. Waterbury Petroleum Prods. Inc.</u>, 845 F.2d 1172, 1176 (2d Cir. 1988).

> In deciding whether to impose sanctions under Rule 37, the Court considers the following factors: '(1) the willfulness of the noncompliant party or the reasons for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the noncompliant party had been warned of the consequences of his noncompliance.'" <u>Nieves v. City of New York</u>, 208 F.R.D. 531, 535 (S.D.N.Y. 2002) (<u>citing</u> <u>Bambu Sales, Inc. v. Ozak Trading Inc.</u>, 58 F.3d 849 (2d Cir. 1995)).

<u>Oseni v. Tristar Patrol Servs.</u>, 05 Civ. 2875 (RJD)(LB), 2006 WL 2972608 at *7 (E.D.N.Y. Oct. 18, 2006); <u>A.V. by Versace, Inc. v. Gianni Versace S.p.A.</u>, 96 Civ. 9721 (PKL)(THK), 98 Civ. 0123 (PKL)(THK), 2002 WL 54610 at *7 (S.D.N.Y. Jan. 15, 2002).

Sanctions may be appropriate under Rule 37(b)(2) if there is noncompliance with an order, "notwithstanding a lack of wilfulness or bad faith, although such factors 'are relevant . . . to the sanction to be imposed for the failure.'" <u>Auscape Int'l v. Nat'l Geographic Soc'y</u>, 02 Civ. 6441 (LAK), 2003 WL 134989 at *4 (S.D.N.Y. Jan. 17, 2003), <u>quoting</u> 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, <u>Federal Practice & Procedure</u> §

2283, at 608 (2d ed. 1994); <u>see</u> <u>Melendez v. Ill. Bell Tel. Co.</u>,
79 F.3d 661, 671 (7th Cir. 1996) ("Bad faith . . . is not re-
quired for a district court to sanction a party for discovery
abuses." (citations omitted)); <u>see also</u> <u>D' Quadrozzi v. New York</u>,
127 F.R.D. 63, 74 (S.D.N.Y. 1989) ("Monetary sanctions are
considered to be relatively mild given the spectrum of Rule 37's
arsenal, and thus may be awarded in the absence of bad faith.").

    B.  Plaintiffs' Misleading Response
       <u>to PWC's Interrogatory</u>

     I issued two Orders on January 28, 2008 and February
28, 2008, both of which required plaintiffs to answer PWC's first
interrogatory by a specific date; plaintiffs failed to comply
adequately with either Order.  Indeed, from the commencement of
this discovery dispute, plaintiffs have repeatedly resisted
disclosing the facts underlying their damage calculations.  At
the first conference concerning this matter, plaintiffs' attorney
asserted that they had already provided an answer to interroga-
tory 1(c) and had no objection to that interrogatory (Tr. 75).
Yet, plaintiffs' first response to this interrogatory interposed
a number of objections (Plfs.' First Response to PWC's Interroga-
tories at 8, 9) in spite of this representation and in contraven-
tion of my January 28, 2008 Order. (Docket Item 375; January 29,
2008 Order attached as Ex. B to Greilsheimer Decl. at 4, 5).  In
addition, plaintiffs' response was wholly inadequate because by

identifying any employee who "supplied, reviewed, prepared, created, or supervised the production of financial data or documents" in addition to "all persons named in any previous disclosures or interrogatories," plaintiffs provided no useful information.  Despite this failure to comply with my January 28, 2008 Order, I allowed plaintiffs an opportunity to "serve a supplemental response, fairly responding to all parts of the interrogatory" (February 28, 2008 Order, Docket Item 258 at ¶ 11) and did not impose sanctions of any kind.

Plaintiffs' subsequent decision to identify Ms. Marketti as one of three employees "most knowledgeable" about damages clearly was not a "fair response" to the interrogatory and, therefore, contravened my February 28, 2008 Order.  Ms. Marketti repeatedly indicated that she had little or no knowledge of each component of plaintiffs' damages and was, therefore, unable to provide substantive information in response to defendants' questioning.

In opposing defendants' application, plaintiffs argue that Marketti's testimony was only unhelpful because defendants failed to ask follow-up questions and failed to refresh Marketti's recollection by showing her documents.  Plaintiffs accuse defendants of using Marketti "as a stalking horse in a poorly veiled attempt to reorder a deposition schedule" (Ruvoldt Letter at 12).  Furthermore, plaintiffs argue that while Marketti may

have lacked knowledge of the calculations she is "one of the employees at Kingsway most knowledgeable as to the underlying documentation, the financial disclosures and at least some of the transactions underlying that accounting for which she was responsible" (Ruvoldt Letter at 12).  Even assuming the truth of this statement, which does not appear to be supported by Marketti's actual testimony, it is clear that Marketti had absolutely no knowledge regarding the lost M&A opportunity,[11] which formed the basis of damages category number 9, little knowledge of the material details of category 7, "Losses due to Currency Mismatch," and no knowledge regarding the understated reserves (category 1) (Marketti Dep. Tr. 15, 21, 45-46, 48).  Therefore, there was no basis to designate Marketti as the most knowledgeable employee with regard to these categories.  Indeed, even in opposition to this motion for sanctions, plaintiffs have failed to identify the areas of Marketti's knowledge with any specificity.

      As the late Honorable Lloyd F. MacMahon, United States District Judge, noted long ago:  "A law suit is not a game but a search for truth.  The ends of justice are served, not by giving one side a vested right to exhaust the other, but by affording

---

      [11]Marketti's lack of knowledge regarding the M&A opportunity is particularly disturbing in light of the fact that plaintiffs were clearly put on notice that PWC's interrogatory sought the identities of those employees who could explain the details of this forfeited M&A opportunity (See Telephone Conf. Tr. 4-7).

both an equal opportunity to a full and fair adjudication on the merits." Polaroid Corp. v. Casselman, 213 F. Supp. 379, 381 (S.D.N.Y. 1962). Accordingly, "in all proceedings . . . there is a 'duty imposed upon counsel to deal fairly and sincerely with the court and opposing counsel so as to conserve the time and expense of all, and that actions may be litigated in an orderly manner.'" Learning Int'l, Inc. v. Competence Assurance Sys. Inc., 90 Civ. 2032 (MBM), 1990 WL 204163 at *3 (S.D.N.Y. Dec. 13, 1990), quoting Basso v. Utah Power & Light Co., 495 F.2d 906, 910 n.1 (10th Cir. 1974); see also Pease v. New York Seven-Up Bot-tling Co., 158 F.R.D. 34, 38 (S.D.N.Y. 1994) (imposing sanctions under Fed.R.Civ.P. 11 for wasting "the time and resources of both the court and [defendant]"). The Advisory Committee Notes to the 1993 Amendments of Rule 37 make it clear that interrogatories "should not be read or interpreted in an artificially restrictive or hyper-technical manner to avoid disclosure of information fairly covered by the discovery request and to do so is subject to appropriate sanctions." See also 8A Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2177, at 317 (2d ed. 1994).

The defendants, here, should not have been forced to spend hours at a deposition attempting to discover which specific transactions out of the larger universe of facts underlying the nine damage categories were within Marketti's knowledge. The

proper course would have been for plaintiffs to identify those categories of damages or those transactions of which Marketti had knowledge and identify any other witnesses who contributed to the damage calculations or if no Kingsway employee had any knowledge of Kingsway's damages, that fact should have been disclosed.  See Fed.R.Civ.P. 26(g) (requiring a party to sign its interrogatory responses and indicating that "by signing, an attorney or party certifies that to the best of the person's knowledge, informa-tion, and belief formed after a reasonable inquiry" the interrog-atory response is accurate) (emphasis added); 8C Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2174 at 302 (2d ed. 1994)("As a general rule a party in answering inter-rogatories must furnish information that is available to it and that can be given without undue labor and expense.").  Once plaintiffs became aware that Marketti would be unable to provide meaningful testimony regarding several of the damage categories, they were obligated under Fed.R.Civ.P. 26(e) to supplement their interrogatory response by identifying other individuals with knowledge as to these categories.  See generally Belmont Holdings Corp. v. Unicare Life & Health Ins. Co., Civ. A. 98-2365, 2000 WL 1920039 at *2 (E.D. Pa. Dec. 1, 2000) ("When a [30(b)(6)] desig-nee is unable to adequately respond to certain relevant areas of inquiry, the designating party has a duty to substitute an appropriate deponent."); McDevitt & St. Co. v. Marriott Corp.,

713 F.Supp. 906, 933 n.7 (E.D. Va. 1989), rev'd on other grounds, 911 F.2d 723 (4th Cir. 1990) (plaintiff's Rule 30(b)(6) witness "was unfamiliar with the underlying assumptions and specific calculations used by other Marriott employees to project [the lost management fee component of] Marriott's damage figures" and therefore plaintiff was prohibited from presenting evidence regarding that area of damages).  Indeed, plaintiffs' failure to fully delineate the bounds of Marketti's knowledge is made all the more troubling by plaintiffs' statements, during the February 28, 2008 telephone conference, that the damage calculations came "from a larger universe of people at these companies" and approximately 180 employees are "most knowledgeable" regarding the facts underlying the damage calculations (Telephone Conf. Tr. at 12-14).  By naming Marketti as one of three witnesses with the most knowledge regarding each component of these damage calculations, when she lacked any knowledge regarding several of the damage categories, plaintiffs made it impossible for defendants to tailor their deposition questions to Marketti's expertise and therefore unnecessarily and vexatiously delayed discovery.  See Learning International, Inc. v. Competence Assurance Systems Inc., supra, 1990 WL 204163 at *2-*3 (imposing sanctions upon defendant for failing to make an adequate inquiry into the information sought by plaintiff's interrogatories, which resulted

in additional proceedings and prolonged depositions).  Accord-
ingly, sanctions are appropriate here.

     C.   <u>The Appropriate Sanction</u>

       Rule 37 provides that the court may impose such sanc-
tions "as are just" including (1) a default judgment; (2) civil
contempt sanctions; and (3) an order requiring the disobedient
party to pay the other party's reasonable expenses including
attorneys' fees.  Fed.R.Civ.P. 37(b)(2); <u>A.V. by Versace, Inc. v.
Gianni Versace S.p.A.</u>, <u>supra</u>, 2002 WL 54610 at *6.  In selecting
the type of sanctions to impose, courts are guided by the goals
of specific deterrence, general deterrence, and achieving compli-
ance with the underlying discovery order.  <u>See Cine Forty-Second
St. Theatre Corp. v. Allied Artists Pictures Corp.</u>, 602 F.2d
1062, 1066 (2d Cir. 1979).  "As the Court of Appeals for the
District of Columbia Circuit has noted, the general deterrence
purpose: 'has special significance in the case of interrogatories
which are supposed to be [served] and answered without the need
for judicial prompting . . . .  If parties are allowed to flout
their obligations . . . the effect will be to embroil trial
judges in day-to-day supervision of discovery, a result directly
contrary to the overall scheme of the federal discovery rules.'"
<u>Int'l Mining Co. v. Allen & Co.</u>, 567 F.Supp. 777, 789 (S.D.N.Y.

1983), <u>citing</u> <u>Dellums v. Powell</u>, 566 F.2d 231, 235 (D.C. Cir. 1977) (internal citations omitted).

Courts in this Circuit have imposed all three types of sanctions available under Rule 37 upon parties who have provided misleading interrogatory responses.  See <u>John B. Hull, Inc. v. Waterbury Petroleum Prod. Inc.</u>, <u>supra</u>, 845 F.2d at 1172 (dismissing plaintiff's claims for his failure to comply with three court orders instructing him to respond to defendant's interrogatories and discovery requests, seeking the factual basis and calculation for each element of plaintiff's damages); <u>Interscope Records v. Barbosa</u>, 05 CV 5864 (DGT)(RML), 2007 WL 14332 at *1 (E.D.N.Y. Jan. 3, 2007) (imposing sanctions pursuant to Rule 37(c) for a <u>pro se</u> defendant's "false and misleading answers to plaintiffs' interrogatories, [which caused] plaintiffs to incur the unnecessary expense of taking depositions in order to obtain accurate information."); <u>Fears v. Wilhelmina Model Agency, Inc.</u>, 02 Civ. 4911 (HB)(HBP), 2004 WL 1065543 at *7-*8 (S.D.N.Y. May 11, 2004) (sanctioning plaintiffs in the amount of $25,000.00 plus attorney's fees for serving inconsistent and "patently deficient" interrogatory responses); <u>Banco De Ponce v. Buxbaum</u>, 90 Civ. 6344 (SWK)(BAL), 1995 WL 92324 at *5-*7 (S.D.N.Y. March 7, 1995) (sanctioning defendant under Rule 11 in the amount of plaintiff's legal fees for defendant's misleading interrogatory responses

which vexatiously caused plaintiff to take the unnecessary deposition of a witness without any knowledge).

Although I believe that a sanction is appropriate in this action, I decline to impose the ultimate sanction of the default judgment.  As noted by the Honorable David N. Hurd, then Magistrate Judge, now United States District Judge, in Fritter v. Dafina, Inc ., 176 F.R.D. 60, 63 (N.D.N.Y. 1997):

> The Court may render a default judgment against a party who has failed to fully comply with a discovery order of the court.  Fed.R.Civ.P. 37(b)(2)(C).  Such a sanction is an extreme measure appropriate only in extreme circumstances.  See Bambu Sales Inc. v. Ozak Trading Inc., 58 F.3d 849, 853 (2d Cir. 1995); Woodstock Ventures LC v. Perry, 164 F.R.D. 321, 322 (N.D.N.Y. 1996) (citing Jones v. Niagara Frontier Transp. Auth., 836 F.2d 731, 734 (2d Cir. 1987)).  Consequently, the Second Circuit limits default judgments to circumstances "involving willfulness, bad faith, or any fault on the part of the disobedient party." Altschuler v. Samsonite Corp., 109 F.R.D. 353, 356 (E.D.N.Y. 1986) (citing Societe Internationale Pour Participations Industrielles Et Commerciales., S.A. v. Rogers, 357 U.S. 197, 212, 78 S.Ct. 1087, 1095-96, 2 L.Ed.2d 1255 (1958)); see Jones, 836 F.2d at 734.

In this case, bad faith could be inferred from plaintiffs repeated disregard of my Orders to disclose the basis of their damage calculations but, ultimately, I have concluded that the more appropriate sanction is to require plaintiffs to reimburse defendants for their attorneys' fees and costs incurred as a direct result of the misleading interrogatory response, namely the costs and legal fees incurred in deposing Marketti and the cost of this application.  Accordingly, defendants are directed

to file and serve on plaintiffs a detailed request for appropri-
ate fees and proof of such expenses within thirty (30) days of
the date of this Order.

IV.  Conclusion

          For the aforementioned reasons, defendants' motion for
sanctions is granted; plaintiffs are to pay defendants' attor-
ney's fees and costs incurred in the taking of the deposition of
Marketti.  Defendants are directed to file and serve on plain-
tiffs a detailed request for appropriate fees and proof of such
expenses within thirty (30) days of the date of this Order.

Dated:  New York, New York
        December 22, 2008

                                    SO ORDERED

                                    _____
                                    HENRY PITMAN
                                    United States Magistrate Judge

Copies transmitted to:

Harold J. Ruvoldt, Esq.
Nixon Peabody LLP
437 Madison Avenue
New York, New York, 10022-7001

William R. Maguire, Esq.
Jeffrey M. Greilsheimer, Esq.
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York, 10004

                         27

Eric J. Marler, Esq.
Karen A. Reardon, Esq.
Scott O. Reed, Esq.
Reardon Golinkin and Reed
208 South LaSalle Street
Chicago, Illinois, 60604