UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

KINGSWAY FINANCIAL SERVICES,          :
INC., et al.,
                                      :

                   Plaintiffs,
                                      :    03 Civ. 5560 (RMB)(HBP)

      -against-
                                      :    OPINION
PRICEWATERHOUSE-COOPERS LLP,               AND ORDER
et al.,                               :

                   Defendants.        :

----------------------------------X


            PITMAN, United States Magistrate Judge:


            I write to resolve a number of outstanding discovery

issues.


I.  Plaintiffs' November 13, 2008
    Letter Seeking Additional Time
    To Conduct Depositions


            In the course of overseeing discovery in this matter,

it became clear that the "default" limit of ten seven-hour

depositions would not be sufficient to give the parties a fair

opportunity to explore the issues in this case.  Accordingly, by

an Order dated February 28, 2008 (Docket Item 258), I granted

each side 135 hours to conduct fact depositions.  By letter dated

November 13, 2008, plaintiffs seek an additional 28 hours of

deposition time, claiming that defendants have unnecessarily

prolonged depositions in an effort to run out the clock and

thereby thwart plaintiffs' efforts to complete discovery. Plaintiffs also seek a ruling that depositions to preserve the testimony of witnesses who will not be subject to subpoena at trial, also know as *de bene esse* depositions, are not subject to the 135 hour limitation and may be taken after the conclusion of discovery.

In support of the former contention, plaintiffs have provided me with DVDs of the depositions of James Svab and Jeff Johnson.  Plaintiffs claim these DVDs demonstrate that the witnesses took long pauses before answering questions and wasted time by reviewing the LiveNote transcriptions of the questions before answering.  Plaintiffs cite approximately 85 instances of specific misconduct by Svab and approximately 131 instances of misconduct by Johnson.  Plaintiffs also submitted excerpts from Svab's supplemental deposition concerning his calendar which plaintiffs claim demonstrate that Svab was capable of responding to questions in a much more direct manner than he exhibited at the prior deposition sessions.  Finally, plaintiffs cite a number of instances in which PwC witnesses denied having any recollection of the information requested and claim that this is also evidence of a bad faith attempt to frustrate discovery.

I have reviewed the DVDs of the Svab and Johnson depositions, paying particular attention to the pauses before answers and to the demeanor of each witness, and conclude that

neither witness appears to have engaged in dilatory conduct. Although the witnesses frequently paused 10-20 seconds before answering a question, the questions were often extremely broad and covered multi-year periods.  Other questions were broad in other respects, inquiring, for example, whether the witness ever did something, saw something or heard something.  On other occasions, the inquiring party would ask and withdraw his own question several times before arriving at a formulation with which he was satisfied.  On other occasions, after being asked a series of specific questions about a subject, the witness was asked whether he provided all the information that he had concerning the subject.  Given the breadth of the questions, the nature of the questioning, the fact that the subjects of the questioning were generally events that occurred at least six or seven years ago and considering the demeanor of the witnesses, I conclude that their pauses in answering merely indicated that the witnesses were considering their answers and that they did not engage in improper dilatory conduct.

I also find that the witnesses' lack of memory in response to various questions does not appear to have been dishonest.  As PwC points out in its response, many of the questions to which witnesses answered that they did not recall the information involved requests for detailed information concerning matters that occurred many years ago (see Letter of

William R. Maguire, Esq., dated November 21, 2008 at 12-13).
Given the age and specificity of the information sought and the
total lack of any evidence rebutting the claimed lack of memory,
there is nothing about the witnesses' testimony that seems
suspicious.  Plaintiffs have not identified any questions that
seek information so fundamental (e.g., "Who did you work for in
2001?") that a witness's lack of memory is inherently suspect.

Since I find that there was no dilatory conduct by PwC
witnesses, plaintiffs' application for an additional 28 hours of
deposition time is denied.

Finally, to the extent that plaintiffs seek a declara-
tion that depositions of unavailable witnesses taken for use at
trial are not subject to the December 31, 2008 discovery deadline
and the 135 hour time limit, plaintiffs' application is denied
without prejudice.  The cases in this District addressing the
issue of whether de bene esse depositions are subject to discov-
ery scheduling orders are in conflict.  Compare George v. Ford
Motor Co., 03 Civ. 7643 (GEL), 2007 WL 2398806 at *11 (S.D.N.Y.
Aug. 17, 2007) (holding that de bene esse depositions are subject
to discovery scheduling orders); Sanofi-Synthelabo v. Apotex
Inc., 02 Civ. 2255 (SHS), 2005 WL 469594 at *1 (S.D.N.Y. Feb. 18,
2005), adhered to on rehearing, 2005 WL 816267 at *1-*2 (S.D.N.Y.
Mar. 25, 2005) (same) with RLS Assocs, LLC v. United Bank of
Kuwait PLC, 01 Civ. 1290 (CSH), 2005 WL 578917 at *6 (S.D.N.Y.

4

Mar. 11, 2005) ("[T]he majority of courts considering this issue have made what can only be described as a federal common law distinction between 'discovery depositions' and 'trial depositions' . . . and have held the latter category permissible even after the discovery deadline has passed.").  The authorities on both sides of the issue are supported by precedent, and neither sides' arguments can be dismissed as ill-considered.  In addition, neither the parties' research nor my own has disclosed any controlling authority from our Court of Appeals.  Given this conflict within the District, it seems inappropriate to penalize a practitioner for being unable to guess correctly how a particular judicial officer would decide the issue.  Thus, I would be inclined to permit plaintiffs (and, of course, defendants) to conduct de bene esse depositions after the discovery deadline and without regard to 135 hour cap due to the lack of clear guidance on the issue.

        However, plaintiffs' current application does not identify the particular witnesses whose testimony plaintiffs seek to preserve for trial.  It is, therefore, impossible to determine whether these witnesses will be within the subpoena power of the Court at the time of trial, and it is also impossible to determine whether these witnesses have already been deposed.[1]  Accord

---

        [1]In addition, since the justification for deposing these witnesses is the preservation of their testimony for trial,
                                                                (continued...)

ingly, plaintiffs' application to conduct <u>de bene esse</u> deposi-
tions without regard to the discovery deadline and the 135 hour
time limit is denied without prejudice to renewal.  Any renewed
application should identify the witnesses whose <u>de bene esse</u>
depositions are sought.

II.  Plaintiffs' November 17, 2008
     <u>Letter re PwC's Document Production</u>

          By letter dated November 17, 2008, plaintiffs assert a
number of deficiencies in defendant PwC's document production.
PwC has responded in a letter dated November 21, 2008, signed by
Jeffrey M. Greilsheimer, Esq. ("Greilsheimer 11-21-08 Letter").
There has been no reply on behalf of plaintiffs.

     A.  <u>Training Materials</u>

          Plaintiffs first complain that there are a number of
deficiencies in PWC's production of documents concerning training
materials.  Specifically, plaintiff seeks production of the
following documents:

          1.  PwC training manuals used during the one-week
              training course, and updates to those materials.[2]

---

     [1](...continued)
plaintiffs should also be precluded from offering their live
testimony at trial.

     [2]The descriptions of the items sought by plaintiffs are
taken substantially from the letter of Harold J. Ruvoldt, Esq. to
                                                  (continued...)

2.   The Slide Show or Power Point presentation used during PwC's one-week training course.

3.   Records of all training attended by Ms. Allnutt regarding PwC audit methodologies and required skills.

4.   Any hard copy or electronic information distributed during those training programs.

5.   Industry specific training materials internal to PwC.

6. Records of any courses taken by Ms. Herzfeld and Ms. Schultze, including any materials received during those training courses, until the time their engagement with American Country ceased.

7.   Written materials supplied during the two week PwC training course.

8.   Records of any courses taken subsequent to the two-week program taken by Herzfeld at the start of her employment.

9.   Any documentation regarding courses taken by Herzfeld after the initial two-week training course

10.   Copies of certificates received by Herzfeld as a result of attending training programs after leaving PwC.

11.   Records of any programs attended by Herzfeld and any materials distributed at those programs.

12.   A list of all PwC seminars or programs attended by Skrodenis.

13.   A list of all CAS seminars or programs attended by Skrodenis.

14.   Records of training programs attended by Svab between 1992 and the time he became a manager in 1997.

---

[2] (...continued)
the undersigned, dated November 17, 2008.

15.   Records of courses Svab took at PwC regarding audits generally and the auditing of insurance companies.

16.   Records of any courses taken by Wagner.

17.   Records of all in-house training programs which Wagner attended at either Coopers & Lybrand or PwC.

18.   Records indicating when Wagner passed each part of the CAS actuarial exam.

19.   Records of CAS training sessions attended by Wagner regarding ranges of reasonable estimates.

20.   Records of training programs Wagner attended at PwC regarding fraud or fraud detection, including any materials received during the training.

21.   Training manuals that are made available to new employees with regard to the naming and saving of electronic files and conventions used by PwC in connection with the naming and saving of electronic files.

22.   Online courses taken by Lahiff through PwC.

23.   Electronic training documents [sic] relating to document retention policies.

24.   All training programs or related documents taken by or provided to PwC's 30(b)(6) witness.

As PwC correctly points out, the remaining claims against it are fraud claims; any claims for negligence or negligent misrepresentation were dismissed by the Honorable Richard M. Berman, United States District Judge, in 2005.  Because the remaining claims are fraud claims, training materials are irrelevant.  Although plaintiffs may get some traction in establishing their claims if they are able to estabish deviations from generally accepted accounting principles, see generally In re Gilat

<u>Satellite Networks, Inc.</u>, CV-02-1510, 2005 WL 2277476 at *20 (E.D.N.Y. Sept. 19, 2005), plaintiffs have not cited any authority suggesting that PwC's adherence or deviation from its own internal policies has any probative value.  Accordingly, plaintiffs' request to compel production of the foregoing training materials is denied.[3]

    B.  <u>PwC Policies & Procedures</u>

Plaintiffs next claim that PwC has failed to produce certain categories of documents concerning PwC's policies and procedures.  Specifically, plaintiffs seek:

25.  PwC's written policy on sampling.

26.  PwC's standard audit procedures.

27.  PwC's policies or procedures with regard to the collection of information from the media in response to document demands and/or a litigation hold.

28.  PwC's overarching data retention policies to the extent they have not already been produced.

29.  The independence and records management policies received by mail on or about January 21, 2008.

30.  A list of all documents in the policy database provided to Lahiff on CD.

The Greilsheimer 11-21-08 Letter asserts that PwC has produced documents responsive to each of these requests and

---

[3] Notwithstanding its relevance objection, PwC has already produced materials responsive to items 14, 22-24 and has identified by Bates number the responsive documents (Greilsheimer 11-21-08 Letter at 6-8).

identifies by Bates numbers or other detailed description, the
specific documents that are responsive to each item.  Since
plaintiffs take no issue with PwC's response, plaintiffs' appli-
cation to compel production of the policy and procedure documents
identified above is denied.

C.   Audit Program Documents

          Plaintiffs next seek to compel production of the
following documents concerning an audit program allegedly main-
tained by PwC:

          31.  Electronically available guidance instruc-
          tions to the template audit program.

          32.  PwC's electronically available audit method-
          ology guidance.

          33.  Templates for task planning available in 2001
          in connection with the auditing process at PwC for
          insurance companies.

          34.  Task Assignment 2001 Engagement Document of
          PwC by American Country, similar to the 2000 Engagement
          Document.

          35.  The template used by PwC employees in 1998
          for calculating PwC's initial range of variance regard-
          ing prior growth of loss experienced at American Coun-
          try by line of business.

          36.  Materials regarding audit fraud assessment
          for the years 1998, 1999 and 2000.

          37.  Documentation in connection with the termi-
          nology used in a Lotus database.

          Again, the Greilsheimer 11-21-08 Letter asserts that
PwC has produced documents responsive to each of these requests

10

and identifies by Bates numbers or other detailed description, the specific documents that are responsive to each item (Greilsheimer 11-21-08 Letter at 12-14).  Since plaintiffs take no issue with PwC's response, plaintiffs' application to compel production of the audit program documents identified above is denied.

D.  <u>Metadata & Attachments</u>

Plaintiffs next seek various types of metadata and the attachments to a number of produced documents.  Specifically, plaintiffs seek:

> 38.  Metadata for Allnutt-12, Bates Stamp Nos. PWC 006241-49, a document composed of an audit program step for testing loss reserves and PwC spreadsheets concerning transportation liability triangles.

> 39.  Metadata for document entitled "Scan detail listing of reported outstanding claims," Bates Stamp No. PWC-006250, which was described as "a test -- step to scan the detail listing of reported outstanding claims and investigate significant unusual items." This document is reviewed in terms of the additional capabilities the audit program gave supervisors to create and modify tasks in the audit process.

> 40.  Metadata and other records showing the dates and times of entries, modifications, creations, or any changes regarding the 2000/2001 database or any other electronic documents that have been produced by PwC.

> 41.  Electronic version, metadata and other system-generated information regarding access for Allnutt-16, Bates Stamp No. PWC-006182, described as "a strategy factor" created by Kathryn Reeg with Ms. Reeg, Ms. Allnutt and Sara Schultze listed as editors.

42.   Actuary memo, prepared by "Ted Wagner -- PWC AIMS," dated September 30, 2001, for which an attachment icon is contained within Allnutt-18, described as "a step in connection with test data provided to the actuary," at PWC-006188.

43.   ACIC 2001 fee workup attached to Allnutt-25, Bates Stamp Nos. PWC-005582-87, a document described as "a budget and/or time table in an appropriate level of detail for the 2001 audit which Allnutt worked on," and which contains an icon for the budget but no attachment.

44.   Independence conversation attached to Herzfeld-1, Bates Stamp Nos. PWC-035190, an e-mail dated October 23, 2001, addressed to the engagement chain of American Country Insurance Company.

45.   Appendices and exhibits to Skrodenis Ex. 4, American Country Insurance Company Actuarial Report on Loss and Loss Adjustment Expense Reserve as of December 31, 1998, Bates Stamp Nos. PWC-0048466-86.

46.   Attachments or the proper Bates range of the attachments to Skrodenis-7, a letter from Imm to Byrne, Bates Stamp No. PWC-044652.

47.   Draft book of the PwC audit provided to American Country prior to the March 8, 1999 meeting and referenced in the document marked as Skrodenis-16.

48.   Missing cover page of the fax, or the complete document, if it is in the possession of PwC, which contains a letter, dated April 22, 1999, to Byrne with an attachement, Bates Stamp Nos. AC-S-FC-147691 to AC-S-FC-1476912.  The letter describes the services provided to American Country by PwC in 1998 and was entered as exhibit Skrodenis-19.

49.   Substitute copy of Skrodenis-21, Bates Stamp No. PWC-002393, and Engagement Letter, dated August 23, 1999, engaging PwC as the independent accountant for American Country Holding in connection with the 1999 audit.  The letterhead on the copy currently in plaintiffs' possession is not intact.

50.   Metadata or identification of the correct Bates number for document Wagner-7, Bates Stamp No. CG-

12

S-002579, an e-mail from Wagner to Chris Gennett dated
February 4, 2002.

51.  Metadata and identity of the custodian for
Wagner-11, Bates Stamp Nos. PWC-018984-98.

52.  Spreadsheet attached to document Wagner-12,
Bates Stamp No. PWC-035307, November 12, 2001 e-mail
exchange between Mr. Wagner and Ms. Allnutt with the
subject:  "ACIC Carries Reserves," or if the document
has previously been produced, identification of its
correct Bates number.

53.  Documents attached to document Wagner-16,
Bates Stamp No. PWC-035253-90, a collection of e-mails
from Mr. Wagner referring to American Country, as well
as the metadata of such documents, or the identifica-
tion of their proper Bates ranges.

54.  .tif image contained in e-mail, Bates Stamp
Nos. PWC-035284-86, which presumably contains comments
to a November 21, 2002 5:02 p.m. fax, including the
metadata or identification of its proper bated number.

Plaintiffs do not identify the types of metadata they

seek nor do they explain why metadata is relevant in this matter.

In addition, plaintiffs do not raise any questions about the

authenticity of any documents produced by PwC nor do they claim

that any document has been improperly "doctored" or modified.

The nature of metadata and the current state of the law

regarding its production are discussed in detail by the Honorable

Frank Maas, United States Magistrate Judge, in Aguilar v. Immi-

gration & Customs Enforcement Div. of the United States Dep't of

Homeland Sec., 07 Civ. 8224 (JGK)(FM), 08 WL 5062700 (S.D.N.Y.

Nov. 21, 2008).  As Aguilar points out, there are three different

types of metadata:  (1) substantive metadata; (2) system

13

metadata, and (3) embedded metadata.  08 WL 5062700 at *3-*4.  In general, metadata is relevant when the process by which a document was created is in issue or there are questions concerning a document's authenticity; metadata may reveal when a document was created, how many times it was edited, when it was edited and the nature of the edits.  In the absence of an issue  concerning the authenticity of a document or the process by which it was created, most metadata has no evidentiary value.  08 WL 5062700 at *5.

In its response, PwC represents that much of the metadata sought by plaintiffs was deleted from PwC's computer system prior to the commencement of this action and no longer exists.  With respect to a number of plaintiffs' requests for metadata, PwC sets forth the date and time on which the documents for which metadata was requested were last modified, but no other information.

In light of the dubious value of metadata and plaintiffs' total failure to explain its relevance to the claims and defenses in this action, plaintiffs' application to compel its production is denied.  Given the advanced stage of discovery in this litigation and the absence of any showing that production of metadata would serve any useful purpose, I am left with the strong sense that ordering the production of metadata would not

shed any light on any of the claims or defenses in this action. This ruling resolves Items 38, 39, 40, 41, 50, 51.

With respect to Item 42, 43, 44, 45, 49, 53 and 54, PwC represents that it has produced the attachments and has identified them by Bates number (Greilsheimer 11-21-08 Letter at 16, 18-20).

With respect to Item 46, PwC represents that the original letter, with attachments, was sent to American Country and that the attachments are not part of the electronically stored copy of the letter (Greilsheimer 11-21-08 Letter at 17). Nevertheless, a party's discovery obligation is obviously not limited to the documents that exist in electronic form.  PwC is directed to review its paper files and produce the attachments to Skrodenis-7 if they still exist within PwC's possession, custody or control.

With respect to Item 47, PwC, through its counsel, represents that it does not believe any responsive documents exist (Greilsheimer 11-21-08 Letter at 17).  I assume that this representation is made after counsel's consultation with PwC and a reasonably diligent search.

With respect to Item 48, PwC represents that it was unable to locate the missing cover page when it searched for documents (Greilsheimer 11-21-08 Letter at 17).  Since it appears

that the cover page was originally sent to American Country, it appears that all parties to this action have lost this document.

With respect to Item 52, PwC represents that the requested attachment does not exist (Greilsheimer 11-21-08 Letter at 19).

E.   Handwritten Notes

Plaintiffs next request handwritten notes taken in 2001 by Svab and Wallace.  Although PwC correctly points out that Svab testified that his practice was to discard his handwritten notes and Allnutt testified that she never observed Wallace taking notes, PwC is directed to confirm with Scab and Wallace that they have no handwritten notes prepared in 2001 concerning American Country.  PwC is to advise plaintiffs of the results of this inquiry in writing.

F.   Reserves

Plaintiffs next seek the following documents concerning reserves:

> 55.  Summary and/or draft print of management reports regarding reserves in connection with the 9/30/98 and 12/31/98 reports.

> 56.  9/30 preliminary draft analysis regarding reserves.

PwC responds to these requests by stating that its policy is to discard draft documents, but that if the draft

16

documents existed when the action was commenced, they have been produced (Greilsheimer 11-21-08 Letter at 22).   Plaintiffs do not take issue with the response.   Accordingly, plaintiffs' application is denied.

G.   Time Records

Plaintiffs next seek the following time records for PwC employees:

> 57.   Skrodenis' billing records and any related documents for the period from September 30, 1998 through December 31, 1998, to the extent that they have not already been produced.

> 58.   Copies of the computerized time records for all of the custodians who billed any time into the system, including the 30(b)(6) witnesses, together with a description of the time billed.

Again, PwC represents that responsive documents have been produced and identifies the documents by Bates number or other similar information (Greilsheimer 11-21-08 Letter at 22-23).   Since plaintiffs take no issue with PwC's representation, plaintiffs' application is denied.

H.   Wagner Documents

Plaintiffs seek the follwing documents concerning work done by Edward Wagner, a PwC actuary who performed actuarial work for American Country.

> 59.   Two files relating to the actuarial work done by Mr. Wagner as of September 2001 and December 2001.

60. Any performance reviews of Mr. Wagner.

61. The DVD used by Mr. Wagner to refresh his recollection.

62. Copies of any presentations given by Mr. Wagner while employed by PwC.

63. The name of the client, a copy of the deposition transcript and an indication of what records PwC maintains with respect to the deposition at which Mr. Wagner testified as an expert.

With respect to Item 59, PwC represents that responsive documents have been produced and has identified those documents by Bates numbers (Greilsheimer 11-21-08 Letter at 23).

With respect to Item 60, PwC represents that it has no responsive documents. Nevertheless, it has requested copies of any performance reviews Wagner may have in his possession and will produce any that relate to his work for American Country (Greilsheimer 11-21-08 Letter at 23).

With respect to Item 61, PwC represents that the documents on the DVD have already been produced to plaintiffs and that additional copies of the documents in electronic format will be produced to plaintiffs (Greilsheimer 11-21-08 Letter at 23).

With respect to Item 62, PwC represents that Wagner never gave any presentations related to his work on American Country and that there are, therefor, no relevant responsive documents (Greilsheimer 11-21-08 Letter at 24).

With respect to Item 63, PwC correctly points out that Wagner is not subject to the automatic disclosure requirements of

18

Rule 26(a)(2)(B) because he is not "retained or specially em-
ployed to provide expert testimony . . . or one whose duties as
the party's employee regularly involve giving expert testimony."
Fed.R.Civ.P. 26(a)(2)(B).  See 8 Charles A. Wright, Arthur R.
Miller & Richard L. Marcus, Federal Practice & Procedure § 2031.1
at 440-41 & n. 6 (2d ed. 1994).  That, however, does not end the
matter.  There is nothing in the Federal Rules of Civil Procedure
that precludes a party from requesting the information listed in
Fed.R.Civ.P. 26(a)(2)(B)(ii)-(v) for employee-experts such as
Wagner.  Accordingly, unless PwC is willing to represent that it
will not elicit expert testimony from Wagner, it is directed to
produce the documents requested in Item 63.  If PwC does repre-
sent that it will not elicit expert testimony from Wagner, the
material sought in Item 63 is irrelevant.

     I.  Materials Related to PwC's
         Duty to Preserve, Collect
         and Produce Documents

      Plaintiffs next request materials bearing on the
adequacy of PwC's preservation, collection and production of
documents.  The specific items in this category requested by
plaintiffs are:

         64.  The names of custodians searched by Pat
        Straughn, as well as the universe of documents sought.

         65.  A copy of the "master sheet" maintained by
        Mr. Soderberg in connection with the document collec-
        tion efforts.

       66.   A list of all the employees who charged time as a result of either being interviewed by phone or having their offices searched by PwC.

In its response PwC states that it has produced the documents and information sought in these requests and specifically identifies the responsive information.  With respect to Item 66, PwC even reproduces the names of the employees who were interviewed or whose files were searched.  Since plaintiffs do not take issue with these statements, plaintiffs' application to compel production of these items is denied.

J.   <u>Other Documents</u>

Finally, plaintiffs seek to compel production of the following miscellaneous documents:

       67.   Adobe files containing the September 30 and December 31, 2001 reports created by Mr. Wagner.

       68.   A document addressed to PwC informing it that KPMG was appointed as auditor for American Country prior to September 3, 2002.

       69.   The names of two employees whose laptop hard drives were imaged by PwC.

PWC's response represents that PwC has produced the documents and information sought and specifically identifies where the documents and information can be found.  Since plaintiffs do not take issue with these representations, their motion to compel these items is denied.

III.   Dore's November 26, 2008
       Application to Compel
       Production of American
       Country's Claims Manual
       and Related Documents

        By letter dated November 26, 2008, defendant Dore seeks
to compel plaintiffs to produce American Country's claims manual
and Claims Committee Meeting Minutes and Notes.  Based on the
representations made in and the deposition excerpt annexed to
plaintiffs' December 18, 2008 letter, it appears that American
Country does not have a claims manual and that there was no
formal claims committee.  It also appears that the witness who
made these statements was not testifying as a 30(b)(6) represen-
tative of American Country and was testifying on the basis of
only his own knowledge.  In addition, plaintiffs' December 10,
2008 letter oddly fails to state that there is no claims manual
and no Claims Committee Meeting Minutes and Notes.

        Assuming that there is, in fact, no claims manual and
no Claims Committee Meeting Minutes and Notes, plaintiffs'
counsel is directed to confirm to defendants' counsel in writing
within ten (10) days of the date of this Order that a reasonably
diligent search has been conducted and that no claims manual and
no Claims Committee Meeting Minutes and Notes exist.

IV.  Motion to Enforce Subpoena
     Served on Locke Lord
     Bissel & Liddell LLP

     By motion served on August 27, 2008, defendant Dore

moves to enforce a subpoena <u>duces</u> <u>tecum</u> served on Locke Lord

Bissel & Liddell LLP ("Locke Lord").[4]  Plaintiffs have cross-

moved to quash the subpoena.

     The subpoena seeks four categories of documents:

          1.  All documents concerning [Locke Lord's] repre-
     sentation of Kingsway, [American Country Holdings, Inc.
     ("ACHI")] or ACIC in connection with the Kingsway
     Restatements, including but not limited to engagement
     letters, billing records, diaries and time sheets,
     memos, analyses, evaluations and communications.

          2.  All documents concerning or mentioning Dore in
     connection with or in relation to the Kingsway Restate-
     ments or any representation of Kingsway Financial
     Services, Inc., Kingsway America, Inc., ACIC or ACHI.

          3.  Documents sufficient to identify each engage-
     ment of [Locke Lord] by or on behalf of Kingsway,
     between the period January 1, 1995 to date, and to
     indicate the subject matter of the engagement, the
     dates of the engagement, the Kingsway individual or
     entity engaging [Locke Lord], the total hours and fees
     billed, and the names and contact information for all
     attorneys and paralegals who worked on the matter.

          4.  Documents sufficient to identify each engage-
     ment of [Locke Lord], by or on behalf of ACHI or ACIC,
     between the period January 1, 1995 to date, and to
     indicate the subject matter of the engagement, the
     dates of the engagement, the ACHI or ACIC individual or
     entity engaging [Locke Lord], the total hours and fees
     billed, and the names and contact information for all
     attorneys and paralegals who worked on the matter.

---

     [4]The subpoena was actually served on Lord Bissel & Brook,
LLP the predecessor to the law firm now known as Locke Lord.

(Schedule A to Subpoena at 3-4, annexed as Exhibit A to Defendant
John A. Dore's Motion to Compel Production of Documents by Lord
Bissel & Brook Pursuant to Subpoena).  Plaintiffs and Locke Lord
assert a number of objections to the subpoena and rely primarily
on the attorney-client privilege, the work-product doctrine and
the alleged irrelevance of the documents sought.

        As noted above, this is a fraud action arising out of
Kingsway Financial Services, Inc.'s ("Kingsway's") purchase of
ACHI in a hostile tender offer in 2001.  Kingsway claims that the
loss reserves of an ACHI insurance subsidiary were insufficient
and that Dore and PwC fraudulently concealed this insufficiency,
with the result that ACHI appeared to be in a better financial
condition than it actually was.  Plaintiffs further contend that,
after discovering the true financial condition of ACHI, they were
forced to increase the loss reserves and restate ACHI's financial
results for the years ending December 31, 2001, December 31, 2002
and the quarter ending March 31, 2002.  Plaintiffs have identi-
fied an attorney with Locke Lord as one of the individuals who
participated in the decision to restate Kingsway's financials and
seek as damages attributable to the allegedly understated re-
serves more than $50 million dollars (Exhibits A and B to the
Supplemental Declaration of Eric J. Marler, Esq., dated Sept. 16,
2008).

With respect to the assertion of the attorney-client privilege and the work-product doctrine, Dore's principal contention is that plaintiffs have waived the protection of these two doctrines by placing the communications with counsel concerning the restatements in issue.

> It is well established doctrine that in certain circumstances a party's assertion of factual claims can, out of considerations of fairness to the party's adversary, result in the involuntary forfeiture of privileges for matters pertinent to the claims asserted.  See, e.g., United States v. Nobles, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); United States v. Bilzerian, 926 F.2d 1285 (2d Cir. 1991).  The loss of the privilege in these circumstances is sometimes described as implied waiver, see, e.g., In re Grand Jury Proceedings, 219 F.3d 175, 182-84 (2d Cir. 2000); Bilzerian, 926 F.2d at 1293, sometimes as "at issue" waiver because it results from the party having placed a contention at issue, see, e.g., Granite Partners, L.P. v. Bear, Stearns & Co., Inc., 184 F.R.D. 49, 54 (S.D.N.Y. 1999); Worthington v. Endee, 177 F.R.D. 113, 116-117 (N.D.N.Y. 1998); 6 Moore's Federal Practice 26.70[6][c] at 26-226 (3d ed. 1997) ("A party also impliedly waives work product protection if it places the substance of the documents for which the protection is claimed at issue.").  Because the words implied and waiver both tend to suggest that the party possessing the privilege intended to give it up, the terms waiver, and implied waiver, are not especially appropriate designations for circumstances in which the party possessing the privilege makes no representation, express or implied, that it intends to surrender its privilege.  In such circumstances, the rule is perhaps more aptly described as one of forfeiture, rather than waiver.

John Doe Co. v. United States, 350 F.3d 299, 302 (2d Cir. 2003); see also In re Grand Jury Proceedings 219 F.2d 175, 182 (2d Cir. 2000); Ruotolo v. City of New York, 03 Civ. 5045 (SHS)(DF), 2005 WL 823015 at *2 (S.D.N.Y. Apr. 7, 2005) ("Waiver of work product

24

protection may result from a party's injection of an issue into the litigation that, in fairness, requires the party to disclose otherwise protected material.").

An implied waiver of a privilege occurs, pursuant to the "at-issue" doctrine, where:

> (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through the affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense.

Tribune Co. v. Purcigliotti, 93 Civ. 7222 (LAP)(THK), 1997 WL 10924 at *6 (S.D.N.Y. Jan. 10, 1997); accord Ruotolo v. City of New York, supra, 2005 WL 823015 at *2-*3; Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A., 210 F.R.D. 506, 509-10 (S.D.N.Y. 2002); Hearn v. Rhay, 68 F.R.D. 574, 581 (E.D. Wash. 1975).  The "at issue" doctrine applies with equal force to assertions of the work-product doctrine.  Ispat Inland, Inc. v. Kemper Env't'l, Ltd., 05 Civ. 5401 (BSJ)(HBP), 2007 WL 2197892 at *3 (S.D.N.Y. July 31, 2007).

Although waiver pursuant to the "at issue" doctrine is most commonly found when a party asserts an advice of counsel defense, "a party does not have to expressly state that it relied on any advice from his attorney."  Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A., supra, 210 F.R.D. at 510.  "Fairness considerations may also come into play where the party

25

asserting the privilege makes factual assertions, the truthful-
ness of which may be assessed only by an examination of the
privileged communications or documents." Falise v. Am. Tobacco
Co., 193 F.R.D. 73, 84 (E.D.N.Y. 2000) (citations omitted); see
In re Broadcom Corp. Sec. Litig., SA CV 1275 GLTMLGX, SA CV 2301
GLTANX, 2005 WL 1403516 at *1 (C.D. Cal. Feb. 10, 2005) ("A party
waives the privilege if it injects into the case an issue that in
fairness requires an examination of otherwise protected communi-
cations."); see also Am. S.S. Owners Mut. Prot. & Indem. Ass'n,
Inc. v. Alcoa S.S. Co., Inc., 232 F.R.D. 191, 198-99 (S.D.N.Y.
2005); Bowne of New York City, Inc. v. AmBase Corp., 150 F.R.D.
465, 488 (S.D.N.Y. 1993).  .  Nevertheless, the "at issue"
doctrine is construed narrowly.  Century 21, Inc. v. Diamond
State Ins. Co., 03 Civ. 5163 (GEL), 2006 WL 2355323 at *3
(S.D.N.Y. Aug. 10, 2006); Arkwright Mut. Ins. Co. v. Nat'l Union
Fire Ins. Co., 90 Civ. 7811 (AGS)(JCF), 1994 WL 510043 at *11
(S.D.N.Y. Sept. 16, 1994).

        Dore claims that the plaintiffs' claim for damages
resulting from the restatement puts at issue plaintiffs' communi-
cations with Locke Lord concerning the need to restate ACHI's
financials.  I conclude that this is not necessarily the case.
Assuming that defendants did misrepresent ACHI's financial status
at the time of Kingsway's tender offer, what sequellae were
proximately caused by that overstatement would ordinarily be

determined by the objective standards of the federal securities laws.  If the overstatement was de minimis, an opinion from Kngsway's counsel that a restatement of financials was necessary would not make it so.  Similarly, if the overstatement was so large that it was unquestionably material, an opinion from Kingsway's counsel that restatement of financials was unncessary would not make it so.  Thus, the advice Kingsway received concerning the need to restate ACHI's financials is immaterial.

However, since Kingsway has chosen to stand on its privilege, it cannot make selective disclosure of its communications with Locke Lord.  Accordingly, Kingsway is hereby precluded from offering any evidence whatsoever of any  communication with any counsel at the time of the restatement  concerning the restatement of ACHI's financials.  It would not be unusual or surprising if Kingsway attempted to prove that it needed to restate ACHI's financials by making reference to its communications with Locke Lord.  Such evidence would clearly put Kingsway's communications with Locke Lord concerning the restatement in issue and would be irreconcilably inconsistent with the position Kingsway is taking in response to Dore's subpoena.  Even if Kingsway merely offered evidence that it concluded that restatement of ACHI's financials was necessary  after consulting with Locke Lord, it would be offering circumstantial evidence that Locke Lord opined that restatement was necessary and such

evidence would put Kingsway's communications with Locke Lord in issue.   In short, any reference to Locke Lord's role in the decision to restate ACHI's financials -- if adduced by plaintiffs -- is hereby precluded both at trial and in connection with any dispositive motion.[5]

Dore also claims that any claim of privilege has been waived by Kingsway's production of some of its communications with Locke Lord.   Assuming without deciding that these documents are privileged communications, their production, at most, waives any privilege applicable to the particular documents produced; it does not result in a subject matter waiver.   Gragg v. Int'l Mgmt. Group (UK), Inc., 5:03-CV-0904 (NPM/DEP), 2007 WL 1074894 at *7 (N.D.N.Y. Apr. 5, 2007); Travel Insured Int'l, Inc. v. iTravelinsured, Inc., 3:05 cv 1305 (MRK), 2005 WL 4012814 at *1-*2 (D. Conn. Nov. 28, 2005); Strategem Dev. Corp. v. Heron Int'l N.V., 90 Civ. 6328 (SWK)(JCF), 90 Civ. 7237 (SWK)(JCF), 1993 WL 6216 at *3 (S.D.N.Y. Jan. 6, 1993), aff'd, 153 F.R.D. 535 (S.D.N.Y. 1994); Martin v. Valley Nat'l Bank, 89 Civ. 8361 (PKL), 1992 WL 196798 at *4 (S.D.N.Y. Aug. 6, 1992).

---

[5]The present motion was made before each side made its Rule 26(a)(2) disclosures, and I assume that communications between plaintiffs and Locke Lord have not been disclosed to any of plaintiffs' testifying experts.   If such communications with counsel have been disclosed to plaintiffs' testifying experts, the issue of whether plaintiffs have put their communications with Locke Lord in issue would have to be reevaluated.

In his reply, Dore also contends that the failure of Locke Lord and plaintiffs to supply an index of documents withheld on the ground of privilege also results in a waiver. Although this argument probably would have been meritorious if it had been raised in Dore's opening brief, he raised it only in reply and it is not, therefore, appropriately considered. United States v. Pepin, 514 F.3d 193, 203 n.13 (2d Cir. 2008); In re Harris, 464 F.3d 263, 268-69 n.3 (2d Cir. 2006); JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V., 412 F.3d 418, 428 (2d Cir. 2005).  However, since there has been no specific identification of the documents being withheld on the ground of privilege and it is possible that some or all of the documents may not be privileged, Locke Lord or plaintiffs are directed to provide an index of he documents responsive to Items 1 and 2[6] of the subpoena that are being withheld on the ground of privilege within thirty (30) days of the date of this Order.  This Order is without prejudice to a subsequent motion by defendants asserting that some or all of the documents withheld are not privileged.

There is, however, one aspect of the subpoena that should be enforced.  Among other things, plaintiffs are seeking the legal fees they incurred in connection with the restatement. Since this claim squarely puts Locke Lord's fees in issue, Locke

---

[6]The documents sought in Items 3 and 4 of the subpoena are irrelevant.

29

Lord or plaintiffs are directed to produce unredacted copies of Locke Lord's bills with respect to the restatement.

Accordingly, except with respect to Locke Lord's bills concerning services it performed in connection with the restatement, Dore's motion to enforce the subpoena to Locke Lord is denied. Within thirty (30) days of the date of this Order, Locke Lord or plaintiffs are directed to produce (1) unredacted copies of Locke Lord's bills with respect to the restatment; (2) an index of documents responsive to items 1 and 2 of the subpoena that are being withheld on the ground of privilege. The cross-motion to quash the subpoena is denied in light of the defendants' having been granted leave to challenge specific assertions of privilege after they receive the index of documents withheld.

Dated:   New York, New York
         December 31, 2008

                              SO ORDERED

                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to:

Harold J. Ruvoldt, Esq.
Nixon Peabody LLP
437 Madison Avenue
New York, New York   10022-7001

William R. Maguire, Esq.
Jeffrey M. Greilsheimer, Esq.
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York   10004

Scott Golinkin, Esq.
Scott O. Reed, Esq.
Reardon Golinkin and Reed
208 South LaSalle Street
Chicago, Illinois   60604